J-S35032-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| ZAMIR ALONZO NOLE | : | |
| | : | |
| Appellant | : | No. 225 MDA 2025 |

Appeal from the Judgment of Sentence Entered October 22, 2024
In the Court of Common Pleas of Clinton County Criminal Division at
No(s): CP-18-CR-0000047-2024

BEFORE: OLSON, J., MURRAY, J., and LANE, J.

MEMORANDUM BY LANE, J.: **FILED JANUARY 08, 2026**

Zamir Alonzo Nole ("Nole") appeals from the judgment of sentence imposed following his jury convictions of simple assault and aggravated assault.[1] We affirm.

The Commonwealth charged Nole in connection with a January 2024 assault on Heath Braunns ("Husband") at a bar in Renovo, Clinton County. At the jury trial in September 2024, Nole claimed self-defense and defense of others, namely his sister. The parties played surveillance videos, which captured the scene in the bar from two different angles, throughout the testimony of the Commonwealth witnesses as well as Nole. We review the trial testimony in detail.

_____

[1] **See** 18 Pa.C.S.A. §§ 2701(a)(1), 2702(a)(2).

Ashley O'Brien ("Bartender") testified, reluctantly, as a Commonwealth witness to all of the following.[2]  On the night in question, she was working as a bartender at the bar.  Her lifelong friend, Brooke Gregory ("Wife") and Wife's husband, Husband, were there as patrons.  Wife was generally "obnoxious" and that night, Bartender told her "a couple times[ to] shut the heck up." N.T., 9/11/24, at 60.  Wife and another patron, Tyshanek Presley ("Sister"), who is Nole's sister, were "[b]ickering" or arguing "throughout the night." *Id*. Bartender explained that Wife was arguing with Husband, and Sister "wanted to butt in" and told Wife to stop.  *Id*.  At some point, Nole was also present in the bar.  Nole listened to Wife and Sister's conversation but did not intervene. *See id*. at 61.  Then, Husband, Nole, and Sister talked together, although Bartender could not hear what they were saying.  *See id*. at 62.  Bartender again told Wife "to shut the hell up" and "shut her mouth." *Id*. at 63.

Nole and Sister went to the other end of the bar, presumably to leave. Bartender did not observe what happened next, but she described the scene on the surveillance video as the Commonwealth played it: "[I]t looked like [Wife] pinched [or grabbed Sister's] boob [*sic*]." *Id*. at 66-67.  At this time, Husband was also standing with Wife and Sister.  Bartender stated that Husband "was not trying to fight anybody," and instead "was trying to diffuse the situation." *Id*. at 67.

---

[2] At the beginning of her direct examination, Bartender agreed that she "would rather not be [t]here as a witness."  N.T., 9/11/24, at 43.

Next, Wife testified to all of the following. She was at the bar with her husband, and she was "mad at him all night" for losing his job that morning. *Id*. at 84. Wife was familiar with, and liked, Sister, whom she had seen once before. *See id*. at 82-83, 95. They talked for thirty to forty-five minutes, but then Sister told Wife to "leave [H]usband alone," and Wife told "her to mind her own business." *Id*. at 83, 95, 96. Sister "left and got her brother," Nole. *Id*. at 96. Wife was also familiar with Nole, although she did not know his name. *See id*. at 85. Then, Husband talked to Sister and Nole. *See id*. Sister and Nole walked in Wife's direction and as they passed her, Sister "shoulder blocked" Wife. *Id*. at 87. Wife denied hitting Sister prior to this.

Wife further testified to the following. At this point, Bartender talked to her, although Wife could not remember the conversation. Wife "walk[ed] to the other end of the bar" toward Husband, but when she arrived, she saw him on the ground, and there was blood on his shirt and the floor. N.T., 9/11/24, at 88-89. Wife tried to rouse him, but he did not wake up. Wife and Husband were "taken for medical treatment" at different hospitals. *Id*. at 89. The Commonwealth presented photos of Husband taken at the hospital; he had lacerations and stitches on his chin and eyebrow and under his eye. *See id*. at 91.

Husband testified that he had no recollection of what happened at the bar. *See id*. at 113. At the hospital, his "head was swelled up," he had "a lot of pain" in his head, and he had a catheter. *Id*. at 114. Husband received

"stitches in four different places on [his] face:" in his eyebrow, beside his eye, under his eye, and on his chin. *Id*. at 114, 116-17. Husband now had scars. At the time of trial, approximately eight months after the incident, Husband continued to have an issue in his left eye: "[s]ometimes when the sun is out[, he will] have this white streak [*sic*]." *Id*. at 114. Husband was in the hospital for approximately twenty-four hours; he left because he did not have insurance and could not "afford to be in a hospital." *Id*. at 115.

The Commonwealth next called Sister, who testified to the following. At the bar, she had a verbal argument with Wife, with whom she had previously met and talked. At trial, Sister could not "really say what [the argument] was about," but Wife was "screaming[,] yelling[,] hooting[,] and hollering about fighting her husband." N.T., 9/11/24, at 123, 124. Sister denied that she "interject[ed] into" their argument," but Wife "called her a bitch and [said] it was none of [her] business." *Id*. at 124. Sister wanted to leave the bar but needed a ride. She sent a text message to a friend, and as a result, her brother, Nole, arrived at the bar.[3] Sister was talking to Nole when Husband approached them and said, "Guys, don't pay her no mind, everything is going to be okay. . . . She's drunk." *Id*. at 127. Sister then walked toward the exit. In response to watching the surveillance video, Sister admitted that she struck Wife, but testified that Wife struck her first. "At this point," Husband

---

[3] Nole testified that he was at this friend's apartment when Sister asked for a ride.

- 4 -

"said bitch get off my wife." *Id*. at 128. Wife also "made threats" that she would "beat [her] up," and Sister "was fearful of" Wife. *Id*. at 128-29.

The Commonwealth next called Pennsylvania State Police Trooper Andrew Adams ("Trooper Adams,") who responded to the scene around 2:00 a.m. "[T]here was a little bit of blood" on the floor in the corner of the bar. N.T., 9/11/24, at 139. The Commonwealth played the surveillance video, which Trooper Adams described as follows: Wife and Sister "were going back and forth." *Id*. at 148. "Nole, for the most part, [was] standing there with his hands in his pockets." *Id*. at 149. The altercation became "physical" when Wife "touched" Sister, and then Sister "pursued [Wife] across the bar punching her several times." *Id*. at 148; *see also id*. at 150 (Trooper Adams testifying that when Wife "touche[d]" Sister, Sister "punche[d] her in the face"). Nole then talked to Sister and Husband in the corner of the bar, and that is "when [Husband] put his hands on" Nole and Sister as they were "trying to walk out of the bar." *Id*. at 149. Nole struck Husband three or four times while Husband was standing. Husband fell to the ground, and Nole struck him ten or eleven more times, while Husband did not make any defense motions. *See id*. at 142.

Nole testified in his own defense to the following. He went to the bar to give his sister a ride. When he walked in, he heard "yelling in the back of the bar" and saw that his sister, Husband, and Wife were in "confrontation." N.T., 9/11/24, at 161. Wife was "yelling" and arguing with Sister. *Id*. at 161-62.

Wife "stormed off," Nole told his sister they should leave, and Husband approached them and said, "[Y]ou all should just leave before things get ugly." *Id*. at 162. Nole responded that he did not want any "problem[s]," and he and Sister walked to the door. *Id*. While Sister put on her jacket, Wife "pushed her" and "they started fighting." *Id*. at 164. At this point, Nole still did not "want to be a part of none of it." *Id*. However, Husband "[came] toward[]" Sister, said, "[B]itch, get off my wife," and "shoved her up against the wall a little bit," and "it looked like he was about to swing on" Nole. *Id*. at 164-65. Nole "just reacted" and "went into defense mode." *Id*. at 164, 166. Nole testified, "I kept swinging until I felt [Husband] was no longer a threat to me and my sister. . . . Everything happened so fast. [I did not] really have time to think about anything." *Id*. at 166. Nole stopped punching Husband once he realized he "was knocked out." *Id*. Nole stated he "never" had a conscious objective to hurt Husband, and instead his intent was to "diffuse" the situation. *Id*. at 167.

On cross-examination, Nole stated that Husband threatened him, in contradiction of Sister's testimony that Husband "was trying to diffuse the situation." N.T., 9/11/24, at 177. In response to the Commonwealth's question, Nole stated that Sister "[lied] on the stand earlier," and acknowledged that he, Sister, Wife, and Bartender "all testified to something different." *Id*. at 177-78.

Nole reiterated that he did not know Husband was unconscious until he threw "[t]he last punch." *Id*. at 169. The following exchange occurred:

> [Commonwealth: A]t this point, 1:21 in the video, when you're standing overtop of [Husband] punching him in the face, did you feel he was a threat to you?
>
> [Nole:] The last punch.
>
> * * * *
>
> Q   I'm asking you a yes or no question. It's pretty simple. Did you feel he was a threat to you at this point at 1:21 in the video when you're standing overtop of him punching him in the face?
>
> A   Yes, yes.
>
> * * * *
>
> Q   Did you feel [Husband] was a threat to you at 1:23 in the video when his body goes limp and you continue punching him in the face?
>
> A   Yes.
>
> Q   . . . At this point you had initially punched [Husband] with your left hand exclusively, correct?
>
> A   Yes.
>
> Q   And at some point here at 1:24 in the video after seven punches on the ground into [Husband's] face with your left hand, you stand up, correct?
>
> A   Yes.
>
> Q   And you switch to your right hand, correct?
>
> A   Yes.
>
> * * * *

Q  You felt he was a threat to you even though you had hit him seven times on the ground in the face hovering over him with your left hand?

A  Yes.

Q  Are you left-handed or right-handed?

A  Right-handed.

* * * *

Q  What was your intention of switching from left hand, which you punched [Husband] seven times in the face with, to your right hand?

A  I was defending myself and my sister.

* * * *

. . . [O]n my last punch once I noticed he was knocked out, I stopped.

* * * *

Q  . . . You didn't notice after punching him seven times with your left hand, standing up and striking him five more times with your dominant right hand that he wasn't moving?  Is that a no?

A  I didn't notice it until the last punch until I figured he was knocked out, and I stopped.

N.T., 9/11/24, at 169-72.  Upon further questioning, Nole acknowledged that Husband did not punch or kick him "at all this entire scuffle," but repeated that Husband had "threatened him" and "move[d] toward[] him." *Id*. at 172.

Finally, relevant to the issues in this appeal, we note the following evidentiary rulings.  First, Nole claimed that Bartender referred to Husband's character trait for non-aggressiveness, and this opened the door for the

defense to present evidence of Husband's prior conviction of assault. The trial court ruled that the Commonwealth did not open the door, but rather Bartender gave the relevant testimony on re-cross examination by the defense. Second, the trial court permitted the Commonwealth's question to Nole, of whether he ever told police he acted in self-defense, as well as Nole's response that he did not. Nole requested a mistrial, claiming the question infringed on his right against self-incrimination and right to remain silent with the police. The trial court denied relief, reasoning that Nole waived his right against self-incrimination because he testified at trial.

The jury found Nole guilty of aggravated assault and simple assault. On October 22, 2024, the trial court imposed a sentence of ten to twenty years' imprisonment and one year's probation. Nole filed a timely post-sentence motion, challenging only the restitution award. The trial court held a hearing and denied Nole's motion.[4] Nole filed a timely notice of appeal, and he and the trial court have complied with Pa.R.A.P. 1925.

Nole raises five issues for our review:

I.   Whether the evidence presented at trial by the Commonwealth was insufficient to disprove [Nole's] claim of self-defense and defense of other beyond a reasonable doubt where [Nole]: (1) was not the initial aggressor; (2) did not provoke the situation which resulted in the need to use force in defense of himself and his sister; and (3) reasonably believed that he and his sister were in imminent danger of bodily injury and serious

---

[4] The trial court, however, modified the restitution award based upon correspondence from the Clinton County victim and witness coordinator. *See* Order, 11/19/24.

- 9 -

bodily injury such that it was necessary to use force to prevent such harm?

II.     Whether the evidence presented at trial was insufficient to support [Nole's] conviction for aggravated assault and simple assault since the Commonwealth failed to prove, beyond a reasonable doubt, that [Nole] intentionally, knowingly, or recklessly caused or attempted to cause bodily injury or serious bodily injury to [Husband]?

III.    Whether the evidence presented at trial was insufficient to support [Nole's] convictions for aggravated assault and simple assault since the Commonwealth failed to prove, beyond a reasonable doubt, that [Nole] caused or attempted to cause serious bodily injury to [Husband]?

IV.     Whether the trial court committed reversible error when it admitted testimony commenting on [Nole's] post-arrest, post-*Miranda*[5] exercise and assertion of his right to remain silent and denied [Nole's] request for a mistrial, where the Commonwealth repeatedly asked [Nole] on cross-examination if he ever told the police about his claim of self-defense prior to testifying at the jury trial?

V.      Whether the trial court committed reversible error by prohibiting [Nole] from introducing evidence of [Husband's] criminal record for crimes of violence where one of the Commonwealth's witnesses put [Husband's] character trait for being confrontational, aggressive and violent at issue?

Nole's Brief at 6-7 (unnecessary capitalization omitted and issues reordered for ease of disposition).

We address Nole's first three issues together, as they all relate to the sufficiency of the evidence. He claims the evidence was insufficient to: (1) disprove his claims of self-defense and defense of others; (2) show the

_____

[5] *See Miranda v. Arizona*, 384 U.S. 436 (1966).

- 10 -

requisite intent for aggravated assault and simple assault; and (3) establish that Husband suffered serious bodily injury, or that Nole attempted to cause him serious bodily injury. This Court has explained:

> Because a determination of evidentiary sufficiency presents a question of law, our standard of review is *de novo* and our scope of review is plenary. In reviewing the sufficiency of the evidence, we must determine whether the evidence admitted at trial and all reasonable inferences drawn therefrom, viewed in the light most favorable to the Commonwealth as verdict winner, were sufficient to prove every element of the offense beyond a reasonable doubt. "[T]he facts and circumstances established by the Commonwealth need not preclude every possibility of innocence." It is within the province of the fact-finder to determine the weight to be accorded to each witness's testimony and to believe all, part, or none of the evidence. The Commonwealth may sustain its burden of proving every element of the crime by means of wholly circumstantial evidence. Moreover, as an appellate court, we may not re-weigh the evidence and substitute our judgment for that of the fact-finder.

***Commonwealth v. Williams***, 176 A.3d 298, 305-06 (Pa. Super. 2017) (citations omitted).

> Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. . . . Moreover, in applying the above test, the entire record must be evaluated and all evidence actually received must be considered. . . .

***Commonwealth v. McClendon***, 874 A.2d 1223, 1228 (Pa. Super. 2005) (citations omitted).

The Pennsylvania Crimes Code[6] provides that a person is guilty of aggravated assault if, in pertinent part, he "attempts to cause serious bodily injury to another, or causes such injury intentionally, knowingly or recklessly under circumstances manifesting extreme indifference to the value of human life[.]" 18 Pa.C.S.A. § 2702(a)(1). The Crimes Code defines "serious bodily injury" as "[b]odily injury which creates a substantial risk of death or which causes serious, permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ." 18 Pa.C.S.A. § 2301.

> To sustain a conviction for aggravated assault, the Commonwealth need not show that serious bodily injury actually occurred, but only that the defendant attempted to cause serious bodily injury to another person. An "attempt" exists when "the accused intentionally acts in a manner which constitutes a substantial or significant step toward perpetuating serious bodily injury upon another."

*Commonwealth v. Rosario*, 307 A.3d 759, 765 (Pa. Super. 2023) (citations omitted).

In *Commonwealth v. Alexander*, 383 A.2d 887 (Pa. 1978), the Pennsylvania Supreme Court

> created a totality of the circumstances test, to be used on a case-by-case basis, to determine whether a defendant possessed the intent to inflict serious bodily injury. *Alexander* provided a list, albeit incomplete, of factors that may be considered[,] including evidence of a significant difference in size or strength between the defendant and the victim, any restraint on the defendant preventing him from escalating the attack, the defendant's use of a weapon or other implement to aid his attack, and his statements before, during, or after the attack which might indicate his intent

---

[6] *See* 18 Pa.C.S.A. §§ 101-9546.

to inflict injury. **Alexander** made clear that "simple assault combined with other surrounding circumstances may, in a proper case, be sufficient to support a finding that an assailant attempted to inflict serious bodily injury, thereby constituting aggravated assault.["]

**Commonwealth v. Matthew**, 909 A.2d 1254, 1257 (Pa. 2006).

A person is guilty of simple assault if, *inter alia*, he "attempts to cause or intentionally, knowingly or recklessly causes bodily injury to another[.]" 18 Pa.C.S. § 2701(a)(1). The Crimes Code defines "bodily injury" as "[i]mpairment of physical condition or substantial pain." 18 Pa.C.S.A. § 2301.

Additionally, the Crimes Code defines the kinds of culpability as follows:

(1) A person acts intentionally with respect to a material element of an offense when:

(i) if the element involves the nature of his conduct or a result thereof, it is his conscious object to engage in conduct of that nature or to cause such a result[.]

* * * *

(2) A person acts knowingly with respect to a material element of an offense when:

(i) if the element involves the nature of his conduct or the attendant circumstances, he is aware that his conduct is of that nature or that such circumstances exist[.]

* * * *

(3) A person acts recklessly with respect to a material element of an offense when he consciously disregards a substantial and unjustifiable risk that the material element exists or will result from his conduct. The risk must be of such a nature and degree that, considering the nature and intent of the actor's conduct and the circumstances known to him, its disregard involves a gross deviation from the

- 13 -

standard of conduct that a reasonable person would observe in the actor's situation.

18 Pa.C.S.A. § 302(b)(1)(i), (2)(i), (3).

The Crimes Code governs self-defense as follows: "The use of force upon or toward another person is justifiable when the actor believes that such force is immediately necessary for the purpose of protecting himself against the use of unlawful force by such other person on the present occasion."  18 Pa.C.S.A. § 505(a).  The Crime Code provides for the defense of others as follows:

> **(a) *General rule.* —** The use of force upon or toward the person of another is justifiable to protect a third person when:
>
> (1) the actor would be justified under section 505 . . . in using such force to protect himself against the injury he believes to be threatened to the person whom he seeks to protect;
>
> (2) under the circumstances as the actor believes them to be, the person whom he seeks to protect would be justified in using such protective force; and
>
> (3) the actor believes that his intervention is necessary for the protection of such other person.

18 Pa.C.S.A. § 506(a)(1)-(3).

This Court has explained:

> A claim of self-defense requires evidence establishing the following three elements:
>
> "(a) that the defendant reasonably believed that he was in imminent danger of death or serious bodily injury and that it was necessary to use deadly force against the victim to prevent such harm; (b) that the defendant was free from fault in provoking the difficulty which culminated in the slaying; and (c) that the defendant did not violate any duty to retreat."

> Although the defendant has no burden to prove self-defense, . . . before the defense is properly in issue, "there must be some evidence, from whatever source, to justify such a finding." Once the question is properly raised, "the burden is upon the Commonwealth to prove beyond a reasonable doubt that the defendant was not acting in self-defense." The Commonwealth sustains that burden of negation "if it proves any of the following: that the [defendant] was not free from fault in provoking or continuing the difficulty which resulted in the [assault]; that the [defendant] did not reasonably believe that he was in imminent danger of death or great bodily harm, and that it was necessary to [commit the assault] in order to save himself therefrom; or that the [defendant] violated a duty to retreat or avoid the danger."

*Williams*, 176 A.3d at 309 (citations omitted and paragraph break added).

In his first issue, Nole asserts the evidence was insufficient to sustain his aggravated assault conviction, because the Commonwealth failed to disprove his claim of self-defense. In support, Nole argues: (1) Husband and Wife initiated the altercation; (2) Nole was not the aggressor and did not provoke the incident; (3) this was "a chaotic and rapidly escalating confrontation," and he "intervened only after witnessing his sister being assaulted by both" Husband and Wife; (4) Husband "raised his arm in a manner that made [Nole] believe an immediate physical assault was imminent;" and (5) Nole "reasonably believed immediate force was necessary to protect himself and his sister from imminent bodily injury." Nole's Brief at 33, 35, 38. Nole maintains that the surveillance video and Bartender's testimony, showing that Wife "instigated the physical altercation and that

- 15 -

[Husband] shoved [Sister] and pinned her against the wall," corroborated Nole's testimony at trial. *Id*. at 35.

In his second issue, Nole asserts the evidence was insufficient to establish aggravated assault and simple assault, where the Commonwealth did not prove he had the requisite intent to cause serious bodily injury to Husband. *Id*. at 41. In support, Nole avers all of the following: his "actions were reactive and defense, aimed at neutralizing an ongoing threat, rather than a conscious disregard for an obvious risk of causing protracted injury." *Id*. at 43. "The Commonwealth presented no direct evidence — such as inculpatory statements, prior animosity, or unprovoked aggression." *Id*. at 42. Instead, the Commonwealth relied only on circumstantial evidence, which "was insufficient to show that [his] 'conscious object' was to cause serious bodily injury to" Husband. *Id*. at 41. Here, Nole's "use of his fists to ward off a perceived assault cannot be equated with conduct 'practically certain' to cause" serious bodily injury. *Id*. at 42. "Unlike scenarios where the nature of the conduct itself gives rise to a presumption of intent — such as firing a gun [—] striking someone with one's fists does not inherently demonstrate an intent to cause death or serious bodily harm." *Id*. at 41-42. With respect to the Commonwealth's argument that Nole struck [Husband] "multiple times after he was on the ground," Nole maintains "this does not automatically establish the requisite *mens rea*," where Nole's uncontroverted trial testimony was that he "did not immediately recognize that [Husband] was incapacitated

and continued striking him only because he still perceived an active threat."
*Id*. at 43.

In his third issue, Nole focuses on Husband's injuries, and asserts the evidence was insufficient to show Nole caused, or attempted to cause, serious bodily injury. Nole acknowledges that Husband testified that he had "stitches in 'four different spots on [his] face[,] ongoing vision issues in his left eye," swelling, and pain. *Id*. at 45 (*citing* N.T., 9/11/24, at 114-17). However, Nole points out that Husband "left the hospital after only 24 hours," and in any event, the Commonwealth did not present any medical records or expert testimony, and thus "the jury was left to speculate whether the injures constituted a substantial risk of death, . . . permanent disfigurement, or . . . protracted loss or impairment of vision." *Id*. Nole describes Husband as having merely "facial lacerations[,] temporary hospitalization," and no "indication of long-term, life-threatening, or permanently debilitating injuries." *Id*. at 45-46.

> In addressing Nole's sufficiency arguments, the trial court reasoned:

> [Nole's] claim of claim of self-defense was presented at trial. The jury considered [Nole's] arguments on the question of self-defense, as well as the evidence presented by both [Nole] and the Commonwealth, and found sufficient evidence to convict [Nole] of [aggravated assault and simple assault]. For this reason, the [trial c]ourt would respectfully request that [Nole's] arguments concerning sufficiency of evidence be rejected, and the verdict of the jury affirmed.

Trial Court Opinion, 4/3/25, at 9.

After review of the record, we determine the trial evidence and all reasonable inferences drawn therefrom, viewed in the light most favorable to the Commonwealth, was sufficient to establish beyond a reasonable doubt aggravated assault and simple assault. *See Williams*, 176 A.3d at 305-06. Similarly, we determine the Commonwealth met its factual burden to disprove Nole's claims of self-defense and defense of others. *See id*. at 309. While Nole urges this Court to discount the video evidence, showing he continued to punch Husband after he fell to the ground and was unconscious, we emphasize that it was within the jury's province to weigh this evidence, along with Nole's testimony, and the jury was free to believe all, part, or none of the evidence. *See id*. at 305-06. The Commonwealth played the surveillance video, second by second, and pointed out, without dispute, that: (1) as Nole "cocked back to hit [Husband, Husband was] standing with his hands at his side;" (2) Nole punched Husband, who then fell to the ground and appeared to be unconscious; and (3) Nole stood over Husband, punched him seven times with his left hand, stood up, and punched him five more times with his right, dominant hand. *See* N.T., 9/11/24, at 168, 171-72. The Commonwealth also played the video during Trooper Adams' examination, and he testified that Nole struck Husband three or four times while Husband was standing, and ten or eleven more times after Husband fell to the ground. *See id*. at 142. We also consider Nole's repeated testimony, both on direct and cross examination,

that it was not until he threw "[t]he last punch" that he realized Husband was unconscious. *Id*. at 166, 169, 171-72.

The above evidence was sufficient to show that Nole attempted to cause, or did cause intentionally, knowingly, or recklessly, serious bodily injury and bodily injury to Husband. *See* 18 Pa.C.S.A. §§ 2701(a)(1), 2702(a)(1). Additionally, regardless of who the initial aggressor was, the evidence was sufficient to **disprove** Nole's claims that he was "free from fault in . . . continuing the difficulty which resulted in the" assault, and that he reasonably believed he and Sister were in imminent danger of great bodily harm. *See* *Williams*, 176 A.3d at 309.

Finally, we reject Nole's arguments that the Commonwealth failed to show Husband suffered serious bodily injury, or injury that created a substantial risk of death, serious, permanent disfigurement, or protracted loss or impairment of the function of an organ. *See* 18 Pa.C.S.A. § 2301. As Nole acknowledges, the Commonwealth need not show a victim in fact sustained serious bodily injury, but may meet its evidentiary burden by showing the defendant "intentionally act[ed] in a manner which constitutes a substantial or significant step toward perpetuating serious bodily injury." *Rosario*, 307 A.3d at 765. In any event, Husband's uncontested testimony was that he received stitches in four different areas in his face, and eight months after the assault, he continued to have vision problems. Nole does not claim, and we have not discovered any authority, that expert testimony about Husband's

injuries was required.  Furthermore, Nole did not make any objection at trial that the nature and extent of Husband's injuries was beyond a lay person's understanding.  *See* Pa.R.A.P. 302(a) (stating that "[i]ssues not raised in the trial court are waived and cannot be raised for the first time on appeal").  Nole's claim, that it is yet to be determined whether Husband's scarring and vision problems are permanent, is meritless.  *See* Nole's Brief at 46, 48.  The evidence of Husband's continued vision problems, viewed in the light most favorable to the Commonwealth, was sufficient to establish a "protracted loss or impairment of the function of [an] organ."  18 Pa.C.S.A. § 2301.  For the foregoing reasons, we determine Nole's first three issues, challenging the sufficiency of the evidence, are meritless.

In his fourth issue, Nole avers the trial court erred in admitting his testimony that he did not tell the police he was acting in self-defense and in defense of Sister.  Nole also asserts the trial court erred in denying his motion for a mistrial on this issue.

> We first consider the applicable standards of review.

> We review a trial court's denial of a motion for a mistrial for an abuse of discretion.  A mistrial is an extreme remedy that is appropriate "only where the incident upon which the motion is based is of such a nature that its unavoidable effect is to deprive the defendant of a fair trial by preventing the jury from weighing and rendering a true verdict."  "It is within the trial court's discretion to determine whether a defendant was prejudiced by the incident that is the basis of a motion for a mistrial."  . . .

*Commonwealth v. Leap*, 222 A.3d 386, 392 (Pa. Super. 2019) (citations omitted).

The Pennsylvania Supreme Court has stated:

> [Q]uestions concerning the admissibility of evidence[, including testimony that a defendant did not want to talk with a police officer,] are within the sound discretion of the trial court and will only be reversed upon a showing that the court abused its discretion.  An abuse of discretion occurs where "the law is overridden or misapplied, or the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias, or ill will, as shown by the evidence or the record."  However, to the extent the question presents as "an issue involving a constitutional right, it is a question of law; thus, our standard of review is *de novo*, and our scope of review is plenary."

**Commonwealth v. Adams**, 104 A.3d 511, 517 (Pa. 2014) (citation omitted).

Article 1, Section 9 of the Pennsylvania Constitution provides that an accused "cannot be compelled to give evidence against himself."[7]  Pa.Const. Art I, § 9.  In **Commonwealth v. Molina**, 104 A.3d 430 (Pa. 2014) (plurality), the Pennsylvania Supreme Court reviewed the development of Pennsylvania jurisprudence on the right against self-incrimination.[8]  **See id**. at 444-49.  The

---

[7] The trial court noted that Nole did not specify whether he was asserting his federal or Pennsylvania constitutional right against self-incrimination.  **See** U.S. Const. Amend. V (stating that no person "shall be compelled in any criminal case to be a witness against himself").  The trial court opted to review Nole's claim under the Pennsylvania Constitution.  **See** Trial Court Opinion, 4/3/25, at 4; **see also Molina**, 103 A.3d at 443 (noting the Pennsylvania Supreme Court "found Section 9 to provide greater protection than the Fifth Amendment").  We thus likewise review Nole's Pennsylvania rights.

[8] The Pennsylvania Court has distinguished pre-arrest silence from post-arrest silence.  **See Commonwealth v. Rivera**, 296 A.3d 1141, 1152 (Pa. 2023) (holding Superior Court erred in applying caselaw concerning pre-arrest silence to an issue involving post-arrest silence).  In **Molina**, the issue concerned testimony about the defendant's **pre-arrest** silence, whereas here, Nole discusses his post-arrest silence.  **See Molina**, 104 A.3d at 433.
*(Footnote Continued Next Page)*

- 21 -

Court noted that generally, the Pennsylvania right against self-incrimination

protects a defendant's "silence as well as overt self-incrimination," and this

> ["]prohibition of any reference to an accused's silence reflects the court's desire that an accused not be penalized for exercising his constitutional rights." Our jurists have long recognized that "most laymen view an assertion of the Fifth Amendment privilege as a badge of guilt," noting that the privilege "would be reduced to a hollow mockery if its exercise could be taken as equivalent either to a confession of guilt or a conclusive presumption of perjury." Accordingly, this Court has long protected a defendant's silence as part of the right against self-incrimination.

*Molina*, 103 A.3d at 446-47 (citations omitted).

The *Molina* Court explained, however:

> Under both state and federal precedent, *the analysis changes dramatically once a defendant decides to testify because he has waived his right against self-incrimination*: "His waiver is not partial; having once cast aside the cloak of immunity, he may not resume it at will, whenever cross-examination may be inconvenient or embarrassing." As the [United States] Supreme Court [has] noted[,] it would undermine the fundamental truth-seeking purpose of our adversary system to prevent the prosecution from questioning the validity of the defendant's testimony in an attempt to uncover fabricated defenses: "Once a defendant decides to testify, the interests of the other party and regard for the function of courts of justice to ascertain the truth become relevant, and prevail in the balance of considerations determining the scope and limits of the privilege against self-incrimination." Accordingly, the prosecution may impeach the testifying defendant with his prior statements, actions, or silence, regardless of whether the statements, actions, or silence occurred prior to or after the reading of *Miranda* rights[]

---

Additionally, we note the lead decision in *Molina* was an opinion announcing the judgment of the court, issued by a plurality of the Court. *See Molina*, 104 A.3d at 432. Nevertheless, none of the concurring or dissenting opinions in *Molina* disagreed with the general principles of law that we set forth above, and thus we cite them as binding authority in this matter.

or the defendant's arrest, if the defendant waives his right against self-incrimination by testifying.

In addition to impeachment, the Commonwealth may utilize a defendant's silence, including pre-arrest silence, as fair response to a defendant's argument at trial. Specifically, . . . we allowed reference to a defendant's refusal to speak to a trooper as a fair response to defense counsel's questioning of the adequacy of the trooper's investigation. Thus, while we hold the right to remain silent sacrosanct, we also protect our adversarial system by allowing cross-examination of a testifying defendant and fair response to the defense's arguments.

*Molina*, 104 A.3d at 447 (citations and footnote omitted[9] and emphasis added).

On appeal, Nole challenges the trial court's admission of the Commonwealth's question, as to whether he ever told police that he acted in self-defense, as well as Nole's response, that he did not. Nole avers the admission of this testimony violated his right against self-incrimination, his due process rights, and the prohibition against the Commonwealth's referring to his post-arrest, post-*Miranda* silence. Nole acknowledges that when a defendant testifies at trial, he generally waives these rights. However, Nole maintains that here, "none of the recognized exceptions for the use of this testimony" applied, because the testimony: (1) was not inconsistent with the Commonwealth's evidence; (2) was not a response to any other testimony, as Nole had not presented "evidence or testimony that the police investigation was shoddy or incomplete;" and (3) was not inconsistent with Nole's other

_____

[9] We discuss this footnote, numbered 16 in *Molina*, *infra*.

testimony or the other evidence presented. Nole's Brief at 23-24. Nole emphasizes that instead, the Commonwealth's improper intent for eliciting the testimony was to undermine his credibility. *Id*. at 10, 21, 25 (citing Commonwealth's argument at sidebar that it "wanted to show the jury 'what a good citizen would do if they were involved in a self-defense type issue'"). Nole requests reversal of the trial court's denial of a mistrial.

In its opinion, the trial court considered the statements in *Molina*, that "if the defendant waives his right against self-incrimination by testifying" at trial, then: (1) "the prosecution may impeach the testifying defendant with his prior statements, actions, or silence, regardless of whether [they] occurred prior to or after the reading of *Miranda* rights or the defendant's arrest;" and (2) "[i]n addition to impeachment, the Commonwealth may utilize a defendant's silence . . . as fair response to a defendant's argument at trial." Trial Court Opinion, 4/3/25, at 5 (*quoting Molina*, 104 A.3d at 447). The court reasoned that here, Nole testified at trial and thus waived his Pennsylvania constitutional right against self-incrimination. Furthermore, the court found the Commonwealth's question — whether Nole ever told the police that he was "trying to protect" himself — was a "fair response to" Nole's claim of self-defense and was a proper attempt to impeach him. *Id*.; *see also* N.T., 9/11/24, at 178.

After review of the record, we determine the trial court did not abuse its discretion in admitting the testimony, and thus did not abuse its discretion in

denying Nole's motion for a mistrial on this issue. *See Adams*, 104 A.3d at 517; *see also Leap*, 222 A.3d at 392. The trial court aptly ruled that because Nole testified in his own defense at trial, he waived his right against self-incrimination under Article I, Section 9 of the Pennsylvania Constitution. *See Molina*, 103 A.3d at 447. This waiver was "not partial; having once cast aside the cloak of immunity, he may not resume it at will, whenever cross-examination may be inconvenient or embarrassing." *Id*. Additionally, as Nole raised self-defense, the Commonwealth's question, as to whether he told police that he acted in self-defense, was a fair response. *See id*.

Furthermore, Nole's claim, that there are "recognized exceptions" to the above waiver rule, is meritless. Nole's Brief at 24. In support, Nole cites a passage in *Rivera*, that "the Commonwealth 'must seek to impeach a defendant's relation of events by reference only to inconsistencies as they factually exist, not to the purported inconsistency between silence at arrest and testimony at trial.'" *Id*. at 23 (*quoting Rivera*, 296 A.3d at 1156) (emphasis in Nole's Brief omitted). While the defendant in *Rivera* did testify in his own defense at trial, he did not give the disputed testimony. Instead, at trial: the prosecutor had asked the arresting officer whether the defendant denied the charges against him; and (2) the officer responded, over the defendant's objection, that upon arrest, the defendant "stood mute and denied none of the charges." *Rivera*, 296 A.3d at 1142. On appeal, the Pennsylvania Supreme Court: did not include in its legal discussion the fact that the

defendant testified at trial; did not refer at all to our law concerning testifying defendant's waiver of his right against self-incrimination; and did not announce, cite, or apply any holding that additional conditions apply when a defendant testifies at trial. **See id**. at 1145; **see also Molina**, 104 A.3d at 445 (noting that "[o]ur jurisprudence regarding references to a defendant's silence is severable into" separate categories, and distinguishing "precedent addressing the right against self-incrimination generally" from "cases where reference to silence is permissible to impeach a defendant who has waived his right by testifying at trial **or** where counsel has raised an argument necessitating the prosecution's fair response") (emphasis added). Accordingly, no relief is due on this claim.[10]

Finally, we review Nole's additional argument, that although the trial court "relied almost exclusively on our Supreme Court's holding in" **Molina**, the court ignored a footnote in that opinion, which appeared in the discussion of a testifying defendant's waiver of his right against self-incrimination. Nole's Brief at 21-22. The footnote stated: "Although a testifying defendant's right is not infringed by reference to his prior silence, given his waiver, a violation of his due process rights may occur because his silence was induced by **Miranda** warnings, **see infra**[.]" **Molina**, 104 A.3d at 447 n.16.

---

[10] As we conclude the trial court did not abuse its discretion in admitting the evidence, we do not reach Nole's alternative argument that the ruling was not harmless error. **See** Nole's Brief at 24-27.

Nole does not discuss that the **Molina** Court expounded on this issue in the next section of its opinion:

> Although, as discussed above, a defendant's testimony may generally be impeached with prior silence, courts have concluded that a prosecutor may not use a defendant's silence after the provision of **Miranda** warnings.  In [**Doyle v. Ohio**, 426 U.S. 610 (1976),], the Supreme Court held that the prosecution violated a defendant's due process rights when it used the defendant's pre-trial silence to impeach the defendant's testimony **after the defendant had been assured of his right to remain silent through Miranda warnings and potentially induced to remain silent**.  The [C]ourt additionally recognized the diminished probative value of silence, post-**Miranda** warnings. "Silence in the wake of these warnings may be nothing more than the arrestee's exercise of these **Miranda** rights.  . . ."

**Molina**, 104 A.3d at 448 (emphasis added).

The above passage addresses trial references to a defendant's silence where the defendant was "assured of his right to remain silent" and was "potentially induced to remain silent." **Id**.  In this case, however, Nole made no claim at trial that he was "induced to remain silent," or that his silence to police, as to whether he acted in self-defense, was in any way related to his **Miranda** warnings.  **Id**.  Accordingly, Nole was waived this argument on appeal.  **See** Pa.R.A.P. 302(a); **see also Commonwealth v. Pi Delta Psi, Inc.**, 211 A.3d 875, 884 (Pa. Super. 2019) (stating that even issues "of constitutional dimension[] are waived if not raised in the trial court," and "[a] new and different theory of relief may not be successfully advanced for the first time on appeal").  Similarly, Nole presents no claim on appeal that the **Miranda** warnings induced his silence; indeed, he does not discuss at all the

- 27 -

circumstances surrounding his **_Miranda_** warnings.  **_See_** Pa.R.A.P. 2119(a) (requiring the appellant's argument to include "the particular point treated therein, followed by such discussion and citation of authorities as are deemed pertinent").  For the foregoing reasons, Nole's fourth claim is meritless.

In his final issue, Nole avers the trial court erred in excluding evidence of Husband' prior criminal conviction of assault.  He avers the Commonwealth's witness, Bartender, opened the door to this evidence by putting Husband's "character trait for being confrontational, aggressive and violent at issue."[11]  Nole's Brief at 28.

As stated above, we review a trial court's evidentiary ruling for an abuse of discretion.  **_See Adams_**, 104 A.3d at 517.  Pennsylvania Rule of Evidence 404(a)(1) provides: "Evidence of a person's character or character trait is not admissible to prove that on a particular occasion the person acted in accordance with the character or trait."  Pa.R.E. 404(a)(1).  We note Rule 404(a)(2)(B) sets forth an exception: "a defendant may offer evidence of an alleged victim's pertinent trait."  Pa.R.E. 404(a)(2)(B).  Finally, "[a] litigant opens the door to inadmissible evidence by presenting proof that creates a false impression refuted by the otherwise prohibited evidence." **_Commonwealth v. Nypaver_**, 69 A.3d 708, 716 (Pa. Super. 2013).

---

[11] Nole does not argue, under Rule of Evidence 404(b)(2), that evidence of Husband's prior bad act or conviction was admissible to show "motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident."  Pa.R.E. 404(b)(2).

At this juncture we review the relevant trial exchange in detail. On re-direct examination, the Commonwealth asked Bartender the following questions, and she provided the following responses:

[Commonwealth:] During the entire couple of hours when [Husband, Wife, and Sister] were in the bar together, **had [Husband] acted aggressively in any manner?**

[Bartender:] Never. Not once. Not one time.

Q Did you overhear him **say anything aggressively?**

A Never. Not once. Nothing aggressive.

Q Did you see [Husband] try to do anything but diffuse the situation?

A No.

N.T., 9/11/24, at 73 (emphases added).

Immediately after this line of questioning, Defense counsel's re-cross examination began as follows:

[Nole:] That was just your interpretation, right?

[Bartender:] No. I mean, I speak to him everyday — not everyday. But a lot. I mean, I've known him for 15 years. Like **he's not aggressive. He's never aggressive.** [Wife] is just a big mouth. He just tried to diffuse the situation.

*Id.* at 74 (emphasis added).

Nole requested a sidebar conference, arguing that Bartender "opened the door to" evidence of Husband's 2015 conviction of assault. *Id.* at 74-75. The Commonwealth denied that its questions "open[ed] the door to anything," and instead, argued it had asked Bartender whether she saw Husband "doing

- 29 -

anything aggressive in the bar that evening." *Id*. at 75. Nole responded that even if Bartender gave the testimony in response to his questioning, "it's still the Commonwealth's witness who should have been advised not to go to that character testimony." *Id*. at 76. The trial court disagreed, and found the Commonwealth did not open the door, and instead it was defense counsel who attempted to open the door. The court thus denied Nole's request to present evidence of Husband's prior conviction of assault.

On appeal, Nole asserts that because he raised self-defense and the defense of others, the issue of "who was the initial aggressor was paramount." Nole's Brief at 32. Nole maintains the Commonwealth's own witness "put [Husband's] character trait for being peaceful and . . . not aggressive at issue," when Bartender stated Husband was not aggressive person. *Id*. at 30, 31. Nole also cites Rule of Evidence 404 and case authority that allow evidence, of a victim's prior conviction of a crime of violence, "to rebut claims of peacefulness and to establish that the victim was in fact the aggressor." *Id*. at 32. Nole insists that in this case, Husband's character's "was not only relevant, but essential to a fair determination of guilt or innocence." *Id*.

In denying Nole's request to present evidence of Husband's prior conviction, the trial court reasoned that the Commonwealth's witness did **not** open the door, but rather the defense attempted to open the door. **See** N.T., 9/11/24, at 76-77. In its opinion, the trial court: reviewed in detail the exchange at trial; reiterated that the Commonwealth's question, to Bartender,

was whether Husband "acted aggressively in any manner" "at a specific moment in time," and found the Commonwealth did ***not*** inquire into Husband's character. Trial Court Opinion, 4/3/25, at 8 (emphasis omitted). The trial court thus disagreed with Nole's contention that it was a Commonwealth witness who put into issue Husband's character trait for being confrontational, aggressive, and violent.

After careful review of the record, we determine the trial court did not abuse its discretion in denying Nole's request to present evidence of Husband's prior conviction. First, we note that at trial, Nole's sole argument for admission of the evidence was that the Commonwealth's witness, Bartender, opened the door to it. ***See*** N.T., 9/11/24, at 74-75. Thus, to the extent Nole now also advances an independent argument, under Rule of Evidence 404(a)(2), that he could have offered evidence of the victim's pertinent trait, he has waived that claim. ***See*** Pa.R.A.P. 302(a).

Second, on appeal, Nole acknowledges that Bartender gave the pertinent testimony — that Husband was "not aggressive" — on re-cross examination by defense counsel. Nole's Brief at 30. However, Nole does not specifically address, nor challenge, the trial court's reasoning that because it was not the Commonwealth who elicited this testimony, it was not the Commonwealth who opened the door. We reiterate that a party opens the door when it "present[s] proof that creates a false impression refuted by the otherwise prohibited evidence." ***Nypaver***, 69 A.3d at 716. We agree with

the trial court's rationale that the Commonwealth simply did not open the door here. On re-direct examination, the Commonwealth asked Bartender specifically whether, on the night in question, Husband acted aggressively or said anything aggressively. *See* N.T., 9/11/24, at 73. Bartender responded that Husband did not. It was not until Nole's re-cross examination that Bartender commented on Husband's general character trait, stating he was "not aggressive" and "never aggressive." *Id*. at 74. Regardless of what defense counsel's question was, it was not the Commonwealth who elicited the response. Accordingly, we do not disturb the court's evidentiary ruling, and no relief is due on Nole's final issue.

As we conclude none of Nole's issues on appeal merit relief, we affirm the judgment of sentence.

Judgment of sentence affirmed.

Judge Murray joins the memorandum.

Judge Olson concurs in the result.

Judgment Entered.

_____
Benjamin D. Kohler, Esq.
Prothonotary

Date: 01/08/2026

- 32 -